FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NORTHERN ALASKA ENVIRONMENTAL
CENTER; NATIONAL AUDUBON
SOCIETY; THE WILDERNESS SOCIETY;
NATURAL RESOURCES DEFENSE
COUNCIL; SIERRA CLUB; ALASKA
WILDERNESS LEAGUE; CENTER FOR
BIOLOGICAL DIVERSITY,
                    *Plaintiffs-Appellants,*

v.

DIRK KEMPTHORNE;* HENRY BISSON;
UNITED STATES BUREAU OF LAND
MANAGEMENT; FISH AND WILDLIFE
SERVICE; UNITED STATES
DEPARTMENT OF THE INTERIOR,
                    *Defendants-Appellees,*

ARCTIC SLOPE REGIONAL
CORPORATION; CONOCOPHILLIPS
ALASKA, INC.; ANADARKO
PETROLEUM CORPORATION; STATE OF
ALASKA,
                    *Defendants-Intervenors-*
                    *Appellees.*

No. 05-35085

D.C. No.
CV-04-00006-J-JKS

OPINION

Appeal from the United States District Court
for the District of Alaska
James K. Singleton, Chief Judge, Presiding

*Dirk Kempthorne has been substituted for his predecessor as Secretary of the Interior. Fed. R. App. P. 43(c)(2).

8347

Argued and Submitted
September 15, 2005—Seattle, Washington

Filed July 26, 2006

Before: Mary M. Schroeder, Chief Judge, Arthur L. Alarcón
and Andrew J. Kleinfeld, Circuit Judges.

Opinion by Chief Judge Schroeder

## SUMMARY

### Environmental Law/Environmental Documents
### (EIR and EIS)

   The court of appeals affirmed a judgment of the district court. The court held that the government was not required at the earliest leasing stage to do a parcel by parcel examination in its environmental impact statement (EIS) of potential environmental effects of its plan to offer oil and gas leases in a wilderness area; such effects were currently unidentifiable, because the parcels likely to be affected were not yet known.

   Appellant environmental groups including the Northern Alaska Environmental Center brought an action in district court in Alaska, challenging the adequacy of the final environmental impact statement (FEIS) prepared by appellee the Bureau of Land Management (BLM) for its plan to offer long term oil and gas leases in the Northwest Planning Area (NWPA). The environmentalists claimed that by not undertaking a parcel by parcel analysis of the environmental consequences of projected exploration and drilling, the BLM had failed to satisfy the National Environmental Policy Act (NEPA) requirement of site specific analysis. They also argued that BLM failed to consider reasonable alternatives, did not discuss mitigation measures, and did not assess the

cumulative impacts of leasing and other activities the environmentalists claimed to be reasonably foreseeable. In addition, the environmentalists contended that the biological opinion issued by appellee the Fish and Wildlife Service violated the Endangered Species Act (ESA). The FEIS conducted an analysis under each scenario for each of the natural resources affected in the area, as, for example, water, wildlife, and specific bird species. Because the analysis was based upon hypothetical future projections of what might be undertaken in the exploration and development phases, and was conducted on a resource by resource basis, the EIS did not attempt to examine the impact on specific parcels, and offered only general mitigation measures. BLM considered an alternative proposed by the Audubon Society, and, although it chose not to adopt the entire alternative, the one it did adopt included some protections similar to those in the Audubon alternative. The district court ruled that the resource by resource analysis of the effects of development in the overall area to be offered for leasing satisfied the site specific analysis requirement of NEPA. It also rejected the environmentalists' secondary NEPA challenges and their claim that there was a violation of the ESA.

The environmentalists appealed.

[1] NEPA requires federal agencies to issue an EIS before undertaking major federal actions significantly affecting the quality of the human environment. [2] NEPA makes it clear that there must be a site specific analysis in the EIS whenever there is an irretrievable commitment of resources by a federal agency to a project.

[3] The government's resolution of the problem of how to give appropriate effect to all the relevant statutes was to consider hypothetical situations that represented the spectrum of foreseeable results, once all phases of the program were completed. [4] At the earliest stage, the leasing stage at issue, there is no way of knowing what plans for development, if

any, may eventually materialize. **[5]** When an agency complies in good faith with the requirements of NEPA and issues an EIS indicating that the agency has taken a hard look at the pertinent environmental questions, its decision should be afforded great deference. The same held true for the instant case. There was no basis for holding that the analysis in the EIS was arbitrary, capricious, or done in bad faith. **[6]** It had to be concluded that the government was not required at this stage to do a parcel by parcel examination of potential environmental effects. Such effects were currently unidentifiable, because the parcels likely to be affected were not yet known. Such analysis must be made at later permitting stages when the sites, and hence more site specific effects, are identifiable.

**[7]** NEPA mandates that BLM provide a detailed statement regarding the alternatives to an agency's proposed action. **[8]** Since BLM adopted components of the Audubon alternative, the BLM adequately examined a range of viable alternatives in preparing the FEIS. **[9]** It had to be concluded that the EIS satisfied the NEPA requirements to consider or properly reject proposed alternatives.

**[10]** NEPA requires only that an EIS contain a reasonably complete discussion of possible mitigation measures. **[11]** Because it was impossible to know which, if any, areas of the NWPA were most likely to be developed, BLM development of more specific mitigating measures could not be required at this stage. BLM, therefore, did not act arbitrarily in providing general mitigation measures in the EIS.

**[12]** NEPA requires that an FEIS consider cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement. **[13]** The cumulative impacts of leasing on the NWPA would have to be addressed at a later stage.

**[14]** The ESA requires the Secretary of the Interior to ensure that an action of a federal agency is not likely to jeop-

ardize the continued existence of any threatened or endangered species. [15] There was insufficient information about the precise location and extent of future oil and gas activities. The biological opinion, therefore, properly relied on a reasonable and foreseeable oil development scenario, which satisfied ESA's requirement for the agency to make projections, based on potential locations and levels of oil and gas activity, of the impact of production on protected species. There was no violation of the ESA at this stage. The judgment of the district court had to be affirmed.

---

## COUNSEL

Deirdre McDonnell, Earthjustice, Juneau, Alaska, for the plaintiffs-appellants.

John A. Bryson, Department of Justice, Washington, D.C., for the defendant-appellees.

Jeffrey W. Leppo, Seattle, Washington, for the defendants-intervenors-appellees.

---

## OPINION

SCHROEDER, Chief Judge:

Since the administration of President Warren G. Harding, the United States has looked to the petroleum and natural gas resources underlying the wilderness of Northern Alaska, but development has come slowly. The frigid region is far reaching and so is the range of wildlife that inhabits it.

The government now proposes to lease vast reaches of the northernmost part of the state, known as the Northwest Planning Area ("NWPA"). In this litigation, a group of environ-

mental plaintiffs have challenged the adequacy of the Final
Environmental Impact Statement ("FEIS") prepared by the
Bureau of Land Management ("BLM") for its plan to offer
long term oil and gas leases in the NWPA. The leases would
enable the oil companies to undertake exploration to deter-
mine what sites, if any, can be developed for productive drill-
ing. The National Environmental Policy Act ("NEPA")
requires an assessment of the effects of major federal action
on the surrounding environment.

According to plaintiffs, the FEIS issued by the Secretary
and BLM to open the NWPA to oil and gas leasing does not
comply with the requirements of NEPA. Plaintiffs allege that
the Department of Interior and BLM violated NEPA because
the FEIS failed to evaluate sufficiently site specific environ-
mental consequences, failed to consider reasonable alterna-
tives, did not discuss mitigation measures, and did not assess
the cumulative impacts of leasing and other activities plain-
tiffs claim to be reasonably foreseeable. Plaintiffs also argue
that the Biological Opinion ("BiOp") issued by the Fish and
Wildlife Service ("FWS") violates the Endangered Species
Act ("ESA").

The plaintiffs' main contention is that the analysis
undertaken for the EIS was inadequate, because it lacked site
specific analysis for particular locations where drilling might
occur. The government responds, we conclude cogently, that
no such drilling site analysis is possible until it is known
where the drilling is likely to take place, and that can be
known only after leasing and exploration. The government
points out that the environmental consequences at specific
sites can be assessed in connection with later applications for
permits for drilling at those sites, and that no permits should
issue without extensive site specific analysis of adverse envi-
ronmental effects and of the mitigation measures appropriate
to minimize them. On that basis, we affirm the district court's
grant of summary judgment in favor of the government.

## BACKGROUND

President Harding established the Naval Petroleum Reserve on Alaska's North Slope in 1923. It was fifty years later, in 1976, that the National Petroleum Reserve Protection Act ("NPRPA") transferred authority over the Reserve to the Secretary of Interior. The Reserve was subsequently renamed the National Petroleum Reserve-Alaska ("NPR-A"). It remains the largest single unit of public land in the United States and covers 23.6 million acres. It is also an important habitat for vegetation, fish, and wildlife.

The NPR-A prohibited petroleum exploration until 1980 when Congress, driven by the fuel crisis of the previous decade, directed the Secretary to carry out an "expeditious program of competitive leasing of oil and gas" on the Reserve. 42 U.S.C. § 6508. The Congressional Act also recognized the subsistence interests of Native American tribes in the area and the need to protect the environment. In 1998, the BLM opened up 4.6 million acres, or 87 percent of the Northeast Planning Area of the Reserve to oil and gas leasing, while carving out various special areas as off limits to leasing. The Northeast Planning Area is also the subject of litigation in the district court.

The portion of the NPR-A at issue here is the Northwest Planning Area, consisting of 8.8 million acres to the west of the Northeast Planning Area. The historical background of the region is well summarized in the district court's opinion in this case that is published at 361 F.Supp.2d 1069 (D.Alaska 2005).

## DEVELOPMENT OF THE FEIS

The BLM published a draft EIS for the NWPA in January 2003 and received considerable critical comment. The BLM published the Final EIS in December 2003 to open parts of the NWPA to leasing. The FEIS adopted the Preferred Alter-

native of the draft EIS, opening the BLM administered lands in the NWPA to leasing subject to certain significant limitations. The BLM would defer for 10 years any leasing on the western most portion of the NWPA, consisting of approximately 17 percent of the proposed area; the FEIS identified the Kasegaluk Lagoon as a special area because of important migratory bird and marine mammal habitat. It imposed no surface occupancy restrictions along the coastal areas and deep water lakes, comprising about 16 percent of the area, and imposed stipulations on development that included set back restrictions and seasonal prohibitions on exploration and development in several of the areas richest in wildlife resources.

Under the plan, the leases are to be offered as individual parcels that vary in size and are identified by number. At the time this record was developed, only a relatively small proportion of the parcels had received bids and only a few leases had been issued. Of the 488 parcels available for leasing, approximately 120 received bids. No exploration had begun.

In assessing the environmental impact of the leasing program for purposes of preparing the FEIS, the BLM had no way of knowing what, if any, areas subsequent exploration would find most suitable for drilling. Thus, it did not do an analysis of any specific parcels.

The BLM did do an analysis of the possible effects of drilling in the climatic environment of the region. That analysis projected two hypotheticals, representing each end of the available spectrum of possibilities. On the basis of experiences in drilling elsewhere in Alaska, the BLM projected types of drilling and patterns of development that might ensue, if, under the first scenario, half of the available parcels were leased for exploration, but no actual development occurred, and, in the second scenario if the total resources available in the area were to be discovered and developed.

The FEIS conducted an analysis under each scenario for each of the natural resources affected in the area, as, for example, water, wildlife, and specific bird species. Because the analysis was based upon hypothetical future projections of what might be undertaken in the exploration and development phases, and was conducted on a resource by resource basis, the EIS did not attempt to examine the impact on specific parcels. That is what gives rise to this litigation.

Plaintiffs filed this action in the United States District Court for the District of Alaska on February 16, 2004. Their principal claim was that by not undertaking a parcel by parcel analysis of the environmental consequences of projected exploration and drilling, the BLM had failed to satisfy the NEPA requirement of site specific analysis. The district court held that the resource by resource analysis of the effects of development in the overall area to be offered for leasing satisfied the site specific analysis requirement of NEPA. It also rejected the plaintiffs' secondary NEPA challenges and their claim that there was a violation of the ESA. This appeal followed.

## DISCUSSION

This court reviews de novo the district court's grant of summary judgment upholding an agency decision. *Natural Resources Defense Council v. U.S. Dept. Of Interior*, 113 F.3d 1121, 1123 (9th Cir. 1997). The appropriate inquiry under the Administrative Procedure Act ("APA") is whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). NEPA requires an EIS to address:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii)   alternatives to the proposed action,

(iv)   the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v)   any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Edwardsen v. United States Department of the Interior*, 268 F.3d 781, 784 (9th Cir. 2001); *see also* 42 U.S.C. § 4332(2)(C)(i)-(v).

[1] Ultimately, NEPA requires federal agencies to issue an EIS before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11 (1985). A court's inquiry, when reviewing whether an agency complied with NEPA, is whether the agency adequately considered a project's potential impacts and whether the consideration given amounted to a "hard look" at the environmental effects. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002). A "hard look" includes "considering all foreseeable direct and indirect impacts." *Id*. at 973. Furthermore, a "hard look" should involve a discussion of adverse impacts that does not improperly minimize negative side effects. *Native Ecosytems Council v. U.S. Forest Service*, 428 F.3d 1233, 1241 (9th Cir. 2005).

This court reviews substantive agency decisions concerning NEPA under the "arbitrary and capricious" standard, meaning we must determine whether the decision by BLM was "based on a consideration of the relevant factors," or whether its action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (quoting the APA, 5 U.S.C. § 706(2)(A)). This court

has held that "NEPA does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999). Under this deferential standard, this court must defer to an agency's decision that is "fully informed and well-considered." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

A.  Site Specific Analysis

[2] With respect to the need for site specific analysis in the EIS, our law under NEPA makes it clear that there must be such analysis whenever there is an "irretrievable commitment of resources" by a federal agency to a project. *See Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988). There is no question here that approval of the leasing program represents an irretrievable commitment of resources. The issue is whether it was sufficiently site specific.

Plaintiffs' major contention is that "site specific" in this context requires an analysis of the environmental effect with respect to each parcel involved in a possible lease for exploration and development. The problem is that until the lessees do exploratory work, the government cannot know what sites will be deemed most suitable for exploratory drilling, much less for development. We are left with a "chicken or egg" conundrum in that if plaintiffs' interpretation of its requirements were adopted, NEPA could never be satisfied in the circumstances of this case.

[3] Our task, however, is to give effect to Congressional intent as expressed not only in NEPA, but also in the 1976 and 1980 enactments relating to the Alaska Reserve. The government's resolution of the problem of how to give appropriate effect to all the relevant statutes in this case was to consider hypothetical situations that represented the spectrum of foreseeable results, once all phases of the program were

completed. We cannot say that this resolution, as set forth in the FEIS, is arbitrary or capricious under our circuit's law.

*Conner v. Burford* is one of our seminal cases considering the procedures for evaluating the environmental effects of leasing programs to develop oil and gas resources. In that case the government instituted programs to sell oil and gas leases without preparing any EIS at all. Two types of leases were involved. One, the so called "no surface occupancy" or "NSO" leases, forbid any use, or even occupancy of the surface of the national forest land being leased, without BLM approval of the specific, surface-disturbing activity the lessees planned to undertake. We held that such leases themselves involved no "irretrievable commitment of resources" and no EIS was required at the leasing stage.

The second and more numerous type of leases in *Conner* were "non NSO" leases. They authorized the lessees to undertake development subject to government regulation of surface disturbing activities such as roads and drilling. The government could not totally preclude such activities, however, and for that reason we held an EIS was required for non NSO leases.

Plaintiffs place principal reliance on *Conner*, but we do not believe it advances their position in this case. Here the leases are more like the "non NSO leases" in *Conner*. The government can condition permits for drilling on implementation of environmentally protective measures, and we assume it can deny a specific application altogether if a particularly sensitive area is sought to be developed and mitigation measures are not available. The government cannot, however, consistent with current statutory imperatives, forbid all oil and gas development in Alaska's NWPA. The leasing program thus does constitute an irretrievable commitment of resources. An EIS is undeniably required, and, indeed one has been prepared.

The issue here is plaintiffs' contention that the EIS is insufficient because it does not undertake a parcel by parcel analysis of surfaces that will eventually be explored and developed. As to this contention, *Conner* is of no assistance to plaintiffs, for we did not discuss the degree of site specificity required in the EIS. The only question was whether one had to be completed at all.

**[4]** We recognize that in arguing that this EIS analysis should have been parcel specific, the plaintiffs raise legitimate concerns about the uncertainty at this stage of gauging the adverse effects that future development may have on this environment. Similar concerns, however, are inherent in any program for the development of natural resources. This is because such projects generally entail separate stages of leasing, exploration and development. At the earliest stage, the leasing stage we have before us, there is no way of knowing what plans for development, if any, may eventually materialize.

**[5]** Such concerns underlay our decision in *Conner* and inform our decision today. They become critically important when dealing in the environmental context of Northern Alaska. Indeed, the D.C. Circuit addressed them in *North Slope Borough v. Andrus*, 642 F.2d 589, 600 (1980), when it upheld an EIS prepared for off shore exploration of resources under the Beaufort Sea, off the Northeast Planning Area. The D.C. Circuit explained that uncertainty is an inherent problem with multi-stage projects such as oil and gas programs, which include separate leasing, exploration, and development stages. *Id.* The court went on to say that "[t]he Secretary [of Interior] plainly cannot be expected or required to wait until the totality of environmental effects is known." *Id.* The D.C. Circuit concluded that when an agency complies in good faith with the requirements of NEPA and issues an EIS indicating that the agency has taken a hard look at the pertinent environmental questions, its decision should be afforded great deference. *Id.* at 599. The same holds true for the instant case. There is no

basis for holding that the analysis in the EIS was arbitrary, capricious, or done in bad faith.

NEPA applies at all stages of the process, however. Any later plan for actual exploration by lessees will be subject to a period of review before being accepted, rejected or modified by the Secretary. *See* 43 C.F.R. § 3162.3-1(c). Plaintiffs will have an opportunity to comment on any later EIS. In addition, before any activity for exploration or development occurs, permits from several agencies may be required and additional permit conditions imposed for the protection of land, water and wildlife resources. *Id.*

[6] For these reasons we conclude that the government was not required at this stage to do a parcel by parcel examination of potential environmental effects. Such effects are currently unidentifiable, because the parcels likely to be affected are not yet known. Such analysis must be made at later permitting stages when the sites, and hence more site specific effects, are identifiable.

We do not agree, however, with the government's further suggestion that any challenge to the sufficiency of the EIS at this stage is premature. The government overreaches when it suggests that the Tenth Circuit's decision in *Park County Resource Council v. United States Department of Agriculture*, 817 F.2d 609 (1987) precludes any challenge to an FEIS at the leasing stage. The Tenth Circuit held that plaintiffs in that case could, at the permit stage, challenge the earlier approval of the leasing program that was instituted without preparation of any EIS. The court held the plaintiffs were not required to make the objection at the earlier stage. The Tenth Circuit therefore recognized that the failure to prepare an EIS could be raised at either stage.

*Park County* is consistent with our decision in *Conner*. It is also consistent with our decision today that plaintiffs are entitled to raise a challenge to the sufficiency of the EIS at

this stage, but that their particular challenge to site specificity lacks merit, and that they will be able to raise more focused criticisms of site analysis at the exploration and permit stages of the leasing program.

B.  Reasonable Alternatives

Plaintiffs argue that BLM violated NEPA by failing to consider an adequate range of alternatives in its FEIS. The district court held, and we agree, that BLM's consideration of the so called "Audubon Alternative" in developing the Preferred Alternative satisfied NEPA's requirement to consider an adequate range of alternatives. The Audubon Alternative was proposed by the Audubon Society in a comment to the draft EIS. It recommended that BLM add four new special areas and, therefore, make 35 percent of the high oil potential area unavailable for leasing.

[7] NEPA mandates that BLM provide a detailed statement regarding the alternatives to an agency's proposed action. *See* 42 U.S.C. § 4332(2)(C)(iii). Consideration of reasonable alternatives is necessary to ensure that the agency has before it and takes into account all possible approaches to, and potential environmental impacts of, a particular project. NEPA's alternatives requirement, therefore, ensures that the "most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971). Under NEPA, "an agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990). An agency need not, therefore, discuss alternatives similar to alternatives actually considered, or alternatives which are "infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Id.* at 1180-81 (citing *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).

Plaintiffs argue that BLM failed to consider a middle ground alternative and that failure to include the Audubon Alternative in the EIS violated NEPA. Plaintiffs concede that five alternatives were considered, but argue that those five alternatives proposed full development or full preservation rather than providing any middle ground. Given the policy objectives of the project, however, consideration of the five alternatives satisfied the NEPA requirement to consider a broad range of possible alternatives. Moreover, as defendants point out, the Preferred Alternative is actually a middle ground alternative because, while it opens 96% of the available land to petroleum development, it places numerous limitations on the leases, including mandatory deferment and no permanent surface occupancy restrictions in some areas.

[8] Although BLM chose not to adopt the entire Audubon Alternative, the Preferred Alternative it did adopt included some protections similar to those in the Audubon Alternative. Since BLM adopted components of the Audubon Alternative in developing the Preferred Alternative, the BLM adequately examined a range of viable alternatives in preparing the FEIS. *See Muckleshoot Indian Tribe*, 177 F.3d at 814.

[9] NEPA does not require BLM to explicitly consider every possible alternative to a proposed action. *Westlands Water District v. United States Department of the Interior*, 376 F.3d 853, 871 (9th Cir. 2004). An agency must, however, explain its reasoning for eliminating an alternative. *See* 40 CFR § 1502.14(a). BLM's explanation that the Audubon Alternative as a whole was inconsistent with the NWPA project and statutory mandates, coupled with its willingness to incorporate several recommendations into the Preferred Alternative, constituted a sufficient explanation for its refusal to adopt the entire Audubon proposal. We agree with the district court, therefore, that the EIS satisfied the NEPA requirements to consider or properly reject proposed alternatives.

C.    Analysis of Mitigating Measures

Plaintiffs also argue that the EIS did not describe and discuss mitigating measures as required by NEPA. According to the plaintiffs, the EIS listed general mitigation measures and did not analyze the effectiveness of each measure. Plaintiffs argue that BLM's development of lease stipulations and Required Operating Procedures ("ROP") intended to reduce the environmental impact of the NWPA oil program did not constitute a sufficient discussion of mitigation.

[10] NEPA requires only that an EIS contain "a reasonably complete discussion of possible mitigation measures." *Robertson v. Methow Valley Citizens Counsel*, 490 U.S. 332, 352, 109 S.Ct. 1835 (1989). The mitigation must "be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d at 1142, 1154 (9th Cir. 1997). In other words, an EIS must include "[m]eans to mitigate adverse environmental impacts." 40 C.F.R. § 1502.16(h). NEPA does not require an agency to formulate and adopt a complete mitigation plan. *Methow Valley*, 490 U.S. at 352, 109 S.Ct. 1835.

In *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 476 (9th Cir. 2000), we held that even though the EIS described the mitigating measures in general terms and relied on general processes, the agency took the requisite hard look and NEPA's mitigation measures requirement was satisfied. We explained that "[t]he exact environmental problems that will have to be mitigated are not yet known because the Project does not exist," but the EIS must contain a discussion of potential adverse effects and possible mitigating measures.

Here, BLM developed stipulations and ROPs to avoid or minimize environmental harms from the oil program. ROPs, which are pre-application requirements, procedures, management practices, or design features, were developed and

included in the EIS to ensure future environmental protection. Specifically, the EIS provided the stipulations and ROPs for each alternative and also outlined their purpose and effectiveness with respect to various resources. According to BLM, the stipulations and ROPs are based on knowledge of the resources in the planning area and current industry standards. BLM also represented that additional protective measures may be developed as part of NEPA evaluations of subsequent permit authorizations, including exploration and development plans.

[11] Because it is impossible to know which, if any, areas of the NWPA are most likely to be developed, BLM development of more specific mitigating measures cannot be required at this stage. BLM, therefore, did not act arbitrarily in providing general mitigation measures in the EIS. *Id.*

D.   Cumulative Impacts of Reasonably Foreseeable Actions

Next, plaintiffs argue that the EIS failed to consider and describe the cumulative impacts of amending the Northeast Integrated Activity Plan/EIS to open previously protected areas to leasing. Here plaintiffs point to BLM's announcement, issued six months before this FEIS, of plans to revise the Northeast EIS in a "Notice of Intent to Amend the Northeast National Petroleum Reserve-Alaska Integrated Activity Plan and to Prepare an Accompanying Environmental Impact Statement, Request for Information, and Call for Nominations and Comments ("Notice of Intent"). Plaintiffs argue that an existing proposal to amend the Northeast EIS covering adjacent areas by removing specified wildlife protections is a foreseeable future action that the BLM must consider in the NWPA EIS.

[12] A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." *Cuddy Mountain*, 137 F.3d at

1378; 40 C.F.R. § 1508.7. NEPA requires that an FEIS consider "[c]umulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2). Ninth Circuit precedent defines a "reasonably foreseeable" action, for which cumulative impacts must be analyzed, to include "proposed actions." *Lands Council v. Powell*, 379 F.3d 738, 746 (9th Cir. 2004) *rev'd on other grounds*, *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005). Furthermore, we have previously held that an action is "not too speculative" when the agency issues a press release and Notice of Intent. *See Tenakee Springs v. Clough*, 915 F.2d 1308, 1313 (9th Cir. 1990); *Muckleshoot Indian Tribe*, 177 F.3d at 812.

[13] The Notice of Intent in this case signifies a proposed action that will require a cumulative effects analysis. Defendants' argument that the proposed amendment is not a reasonably foreseeable action is unpersuasive. As the district court properly explained, however, the issue is one of timing. In the Notice of Intent, the agency has in effect given notice that it will consider all impacts, cumulative and site specific, in any modification to the EIS in the Northeast Planning Area. *See Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1357-58 (9th Cir. 1994) ("having persuaded the district court that it understands its duty to follow NEPA in reviewing future site-specific programs, judicial estoppel will preclude the Forest Service from later arguing that it has no further duty to consider the cumulative impact of site specific programs.") (citations omitted). The cumulative impacts of leasing in the Northeast Planning Area on the NWPA will have to be addressed at a later stage.

E.   Endangered Species Act Violations

Plaintiffs allege that the FWS and BLM failed to satisfy the ESA because the Biological Opinion ("BiOp") prepared by the Fish and Wildlife Service ("FWS") (1) fails to assess the

entire agency action, and (2) ignores the uneven distribution of two bird species: Steller's eiders and spectacled eiders.

[14] The ESA "requires the Secretary of the Interior to ensure that an action of a federal agency is not likely to jeopardize the continued existence of any threatened or endangered species." *Conner*, 848 F.2d at 1451-52; *see also* 16 U.S.C. § 1536(a)(2), Section 7(a)(2). The ESA sets forth a "process of consultation whereby the agency with jurisdiction over the protected species issues to the Secretary a "biological opinion evaluating the nature and extent of jeopardy posed to that species by the agency action." *Conner*, 848 F.2d at 1452; See also 16 U.S.C. § 1536(b). To comply with these requirements, "each agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

Here, BLM requested formal consultation with FWS because the NWPA contains two endangered species, the spectacled and Steller's eiders. After an unsuccessful initial consultation and attempt to produce a satisfactory BiOp, BLM developed "assumptions" about oil and gas activities to assist the FWS in issuing a "no-jeopardy" determination.

[15] Plaintiffs argue that the BiOp violated the ESA because it relied on improper assumptions in assessing the entire BLM action and because it ignores the fact that eiders are unevenly distributed. As discussed earlier, however, there is insufficient information about the precise location and extent of future oil and gas activities. As the district court properly held, the projections used are based on potential oil and gas activity as envisioned by this Court in *Conner*. 848 F.2d at 1454. The BiOp, therefore, properly relied on a reasonable and foreseeable oil development scenario, which satisfied ESA's requirement for the agency to "make projections, based on potential locations and levels of oil and gas activity, of the impact of production on protected species." *Id.* There was no violation of the ESA at this stage. If future actions differ from the BiOp assumptions, BLM must reinitiate consulta-

tion with the FWS. *See* 50 C.F.R. § 402.16(b). The ESA, therefore, requires environmental analysis beyond this initial stage where agency action causes an effect to listed species or critical habitat that was not considered in the BiOp. *Id.*

## CONCLUSION

The district court correctly held that at this early stage of the oil and gas program in the NWPA of Alaska, the FEIS prepared by BLM did not violate NEPA or the ESA.

AFFIRMED.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2006 Thomson/West.

MOATT   INMATT
i

INTERNAL USE ONLY: Proceedings include all events.
05-35085 No. Alaska Environ, et al v. Norton, et al

NORTHERN ALASKA ENVIRONMENTAL          Deirdre A. McDonnell, Esq.
CENTER                                 FAX 907-463-5891
    Plaintiff - Appellant              907/586-2751
                                       [COR LD NTC ret]
                                       EARTHJUSTICE LEGAL DEFENSE FUND,
                                       INC.
                                       325 Fourth St.
                                       Juneau, AK 99801

NATIONAL AUDUBON SOCIETY               Deirdre A. McDonnell, Esq.
    Plaintiff - Appellant              (See above)
                                       [COR LD NTC ret]

THE WILDERNESS SOCIETY                 Deirdre A. McDonnell, Esq.
    Plaintiff - Appellant              (See above)
                                       [COR LD NTC ret]

NATURAL RESOURCES DEFENSE              Deirdre A. McDonnell, Esq.
COUNCIL                                (See above)
    Plaintiff - Appellant              [COR LD NTC ret]

SIERRA CLUB                            Deirdre A. McDonnell, Esq.
    Plaintiff - Appellant              (See above)
                                       [COR LD NTC ret]

ALASKA WILDERNESS LEAGUE               Deirdre A. McDonnell, Esq.
    Plaintiff - Appellant              (See above)
                                       [COR LD NTC ret]

CENTER FOR BIOLOGICAL                  Deirdre A. McDonnell, Esq.
DIVERSITY                              (See above)
    Plaintiff - Appellant              [COR LD NTC ret]


    v.


GALE NORTON                            John A. Bryson, Esq.
    Defendant - Appellee               FAX 202/353-1873
                                       202/514-2740
                                       [COR LD NTC usa]
                                       DOJ - U.S. DEPARTMENT OF
                                       JUSTICE
                                       Environment & Natural Resources
                                       Division
                                       P.O. Box 23795, L'Enfant Plaza
                                       Station
                                       Washington, DC 20026-3795

                                       Dean K. Dunsmore, Esq.
                                       FAX 907/271-5827
                                       907-271-5452
                                       Suite 504
                                       [COR LD NTC usa]
                                       DOJ - U.S. DEPARTMENT OF

INTERNAL USE ONLY: Proceedings include all events.
05-35085 No. Alaska Environ, et al v. Norton, et al

|  | JUSTICE<br>Environment & Natural Resources<br>Division<br>801 "B" St.<br>Anchorage, AK 99591-3657 |
|---|---|
| HENRY BISSON<br>    Defendant - Appellee | John A. Bryson, Esq.<br>(See above)<br>[COR LD NTC usa]<br><br>Dean K. Dunsmore, Esq.<br>(See above)<br>[COR LD NTC usa] |
| UNITED STATES BUREAU OF LAND<br>MANAGEMENT<br>    Defendant - Appellee | John A. Bryson, Esq.<br>(See above)<br>[COR LD NTC usa]<br><br>Dean K. Dunsmore, Esq.<br>(See above)<br>[COR LD NTC usa] |
| FISH AND WILDLIFE SERVICE<br>    Defendant - Appellee | John A. Bryson, Esq.<br>(See above)<br>[COR LD NTC usa]<br><br>Dean K. Dunsmore, Esq.<br>(See above)<br>[COR LD NTC usa] |
| UNITED STATES DEPARTMENT OF<br>THE INTERIOR<br>    Defendant - Appellee | John A. Bryson, Esq.<br>(See above)<br>[COR LD NTC usa]<br><br>Dean K. Dunsmore, Esq.<br>(See above)<br>[COR LD NTC usa] |
| ARCTIC SLOPE REGIONAL<br>CORPORATION<br>    Defendant-intervenor -<br>Appellee | David C. Crosby, Esq.<br>FAX 907/586-5959<br>907/586-6262<br>[COR LD NTC ret]<br>DAVID C. CROSBY, P.C.<br>5280 Thane Road<br>Juneau, AK 99801-7717 |
| CONOCOPHILLIPS ALASKA, INC.<br>    Defendant-intervenor -<br>Appellee | Jeffrey W. Leppo, Esq.<br>FAX 206/386-7500<br>206/624-0900<br>Suite 3600<br>[COR LD NTC ret]<br>Laura J. Beveridge, Esq.<br>FAX 206/386-7500<br>206/386-7641 |

INTERNAL USE ONLY: Proceedings include all events.
05-35085 No. Alaska Environ, et al v. Norton, et al

                              [COR ret]
                              STOEL RIVES, LLP
                              600 University St.
                              Seattle, WA 98101-3197

ANADARKO PETROLEUM CORPORATION    Jeffrey W. Leppo, Esq.
     Defendant-intervenor -       (See above)
Appellee                          [COR LD NTC ret]
                                  Laura J. Beveridge, Esq.
                                  (See above)
                                  [COR ret]

STATE OF ALASKA                   Lawrence Z. Ostrovsky
     Defendant-intervenor -       907/269-5100
Appellee                          Suite 200
                                  [COR LD NTC dag]
                                  AGAK - OFFICE OF THE ALASKA
                                  ATTORNEY GENERAL (ANCHORAGE)
                                  1031 W. Fourth Ave.
                                  Anchorage, AK 99501

                                  Ethan Falatko, Esq.
                                  FAX 907/465-2417
                                  907/465-3600
                                  [COR LD NTC dag]
                                  AGAK - OFFICE OF THE ALASKA
                                  ATTORNEY GENERAL (JUNEAU)
                                  P.O. Box 110300
                                  Juneau, AK 99811-0300